UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LONG PLAYER LP, | Case No.18-CV-2414 (LGS) |
| Plaintiff, | **DECLARATION OF** <br> **JEREMY SOUSSAN** |
| -against- | |
| GOLD MAIDEN LLC, *et al.*, | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I am the sole member of defendant Gold Maiden LLC, a member of defendant BluePrint Industries, LLC ("BluePrint" or the "Company"), a member of defendant Souvah LLC ("Souvah"), and an individually named defendant in this action. This affidavit is submitted in support of defendants' cross-motion to dismiss and in opposition to the motion by plaintiff Long Player LP ("Long Player") for a Preliminary Injunction. For the reasons set forth below, and in the accompanying memorandum of law of defendants, and the accompanying Declaration of Defendant Shahab Daniel ("Dan") Vahdat, the motion should be denied, and the Temporary Restraining Order and Asset Freeze Order (collectively, "Freeze Order") obtained by plaintiff without prior notice to defendants, lifted. I am fully familiar with the facts and circumstances set forth herein.

2. Among the many shocking aspects of this action is the way plaintiff and its principal Chris Goyer ("Goyer") brought this surprise attack. While my partner, Shahab Daniel ("Dan") Vahdat, and myself have continued to keep the Company alive, generating business to keep the business afloat, Plaintiff and Goyer have been absentee owners and participants in BluePrint for nearly four years. Even before the time that Goyer checked out of BluePrint and continuing to date, Goyer, directly and indirectly through entities he owns and/or controls, has diverted business opportunities away from BluePrint, failed to pay BluePrint for expenses it

incurred on behalf of Goyer and its entities, failed to account to BluePrint for profits he is obligated to share with BluePrint, and failed to devote any of his time and business efforts to BluePrint, in violation of the agreement he claims was breached. With the benefit of the entire factual background, the Court will see that plaintiff has "unclean hands" and not entitled to an equitable relief.

3. At the outset, it is critically important for the Court to know that neither myself nor any of the other defendants have wrongfully transferred or diverted any assets from BluePrint, dissipated any such assets or concealed them. Every single one of the payments listed in Goyer's March 16, 2018 affidavit ("Goyer Aff.") is a legitimate business transaction in which BluePrint also received a payment. Consistent with the loose and slippery manner in which it presents its claims, plaintiff has misstated the total amount of the transfers by an astounding 23%. The proper calculation for the payments – all of which were proper and legitimate business expenses – is $3,761,009.81. These payments are referred to as the "Souvah Transfers".

4. The claims made by plaintiff in the Goyer Aff., Verified Complaint and Memorandum of Law are based on a very breezy and superficial description of the business of BluePrint and how its business is conducted. Goyer claims that the first time he noticed any payment from the operating account of BluePrint to Souvah was on or about February 21, 2018. This statement is remarkable in and of itself. Since the time the Company began operations in or about 2010, it has maintained its only business operating account at JP Morgan Chase Bank ("Bank Account"). Since that time, the log-in access code to the Bank Account has been the same and has been shared only with myself, Dan Vahdat, my partner, Goyer and the BluePrint accountant / bookkeeper (a fourth partner, who has since been bought out, also had access). Linda Goyer, Chris Goyer's mom, was the BluePrint accountant/ bookkeeper when the Company began operations

and remained in that position up until February 2012. Since that time, Cheryl Hays, a close friend of Linda Goyer, has been the Company accountant/ bookkeeper.

5. Chris Goyer has had complete, uninterrupted and unfettered access, both online and physical, to the Bank Account since the Company began. His alleged surprise about the transactions between BluePrint and Souvah since 2014—even if true—underscores the fact that he has had absolutely no interest in, or involvement with, the Company's business since 2014. Although, as described below, defendants have nothing to hide about the transactions plaintiff complains about, all Goyer had to do at any time since the Company began was log-on to the Bank Account and he would have seen all these transactions, just as he has now.

6. The reason why Goyer did not bother to even review the banking activity of the Company for four years was because, upon information and belief, he was comfortable with the benefits he has been receiving from the competing businesses he owns and operates.

7. Plaintiff bases its claims on an incomplete and, in some instances, incorrect description of the background of BluePrint and its business. First, the Company was formed in December 2010 in Delaware. Second, my understanding is that the Amended and Restated Limited Liability Company Agreement attached as Exhibit 1 to the Goyer Aff. ("Operating Agreement") was never signed. I do not recall signing it, I do not have a signed copy and based on my inquiry last week, I was told that the attorneys at Troutman Sanders do not have it either. (*See Goyer Aff.* ¶ *4.)*

8. Even if the Operating Agreement had been signed and assuming that it is binding in any event, neither Mr. Vahdat nor myself have violated the Operating Agreement as plaintiff claims. In addition, even if there were a basis to claim such a violation, we can demonstrate Goyer's flagrant abuses of the Operating Agreement, which, I am advised, would relieve us of

further obligations under that agreement.

## The Formation and Operation of Blueprint

9.      The idea for the Company began in 2010.  My background was in working with publishers and having them run traffic through the publisher/affiliate network. My principal role was to manage the business of the Company and bring publishers to the network. Mr. Vahdat had prior experience with advertisers and was tasked primarily with bringing advertisers to the network.

10.     Goyer was experienced as a publisher, owning a publishing company known as HakiBird, LLC ("HakiBird"). Goyer's role was to run his publishing traffic through the BluePrint network and to create a separate publishing division under BluePrint.

11.     The Company performed reasonably well in its first two years of operations.  As pointed out by Goyer in his affidavit, there was a fourth member of the Company, whose interest was bought out, leaving Long Player (Goyer), Gold Maiden (my entity), and United Tristar (Mr. Vahdat's entity) holding equal one-third interests.

12.     After the Company paid the three remaining members back their capital contributions, the Company has made $5,000 monthly draw disbursements to the three members. Since the Company began, I have never drawn a salary for the time and services committed to the Company as a Manager.

13.     Each month, the Company's accountant/bookkeeper (first, Mrs. Goyer, and from February 2012 to present, Mrs. Hays) distributes by email to Goyer, Mr. Vahdat and myself financial statements consisting of balance sheets and profit and loss statements for the Company. Quarterly, bi-annual and annual statements are also distributed.  An example of an email distribution of the financials by Mrs. Hays to the members, dated May 11, 2015 covering the period

January-April 2015, and the accompanying Profit & Loss statement is attached as **Exhibit A**. An example of an email distribution of the financials by Mrs. Hays to the members, dated June 19, 2017 covering the period January-May 2017, and the accompanying Profit & Loss statement is attached as **Exhibit B**. To preserve confidential and proprietary information of the Company, all the figures on the Profit & Loss statements attached to **Exhibits A** and **B**, other than the Total Income and Cost of Goods Sold-Publisher lines, are redacted for present purposes.

14. In the unredacted version to be delivered to the Court, the P&L statement will show that the cost of goods sold is approximately 89 % of the total income for the period shown. On average, throughout the history of the Company, the cost of goods sold is typically greater than 80% of the income of the Company monthly. As reflected on the P&L statements, the cost of goods sold is the payment due to the publisher. Therefore, the payments made by the Company to Souvah are not "fraudulent withdrawals of Company funds" (Goyer Aff., ¶ 28), but payments to the publisher (in this case, Souvah) for commissions earned, with BluePrint retaining its agreed upon margin—just as it does for other publishers on the network, including HakiBird, when Goyer was sending business to BluePrint.

15. HakiBird received payments from the Company as a publisher, just as Souvah has been since 2014. Indeed, those payments have been more than $6 million in the aggregate. As an example, attached as **Exhibit C** is a redacted copy of the November 2011 statement from the Bank Account showing an ACH payment of $468,179.90 to HakiBird. This amount was 52% of the total withdrawals from the Bank Account for that month.

16. Plaintiff may argue that payments made by the Company to HakiBird as a publisher is different than those made to Souvah as a publisher. But, as shown below, Souvah was established by Mr. Vahdat and myself to be a publisher to drive business for the Company to fill

the void left by Goyer's decision to unilaterally desert the business.

### **Goyer Deserts the Business of BluePrint**

17. When the business began, Goyer did run Hakibird traffic through BluePrint, and BluePrint kept a publisher network margin on this publishing traffic typically at a rate of 10-15%, depending upon the volume of traffic and related factors. But, Goyer never created a separate, viable publishing division for the Company as promised. In or about July 2012, Mr. Vahdat brought an opportunity to BluePrint through one of his contacts to license software known as "Goldbar", which was known to be efficient in establishing publisher traffic. Goyer was tasked to implement, manage and develop this application for the Company. Unwilling to do so, Goyer insisted that he would develop the software for his own company, Hakibird, with all implementation and development costs and expenses, and resulting profits to be split between HakiBird and BluePrint.

18. This arrangement continued for under two years with BluePrint paying substantially all the fees for the software and never being reimbursed by Goyer. Goyer also failed to report the profits generated by the Goldbar-based publishing platform, which was supposed to be split with BluePrint. Moreover, he opened several more accounts with this software without BluePrint and used it to make money on his own, which he never accounted for.

19. At or about this time in late 2013-early 2014, Goyer essentially ceased all communications with Mr. Vahdat and myself. Although he was required under Section 10.1 of the Operating Agreement to devote at least 50% of his time and business efforts to the Company, he breached this provision by completely checking out and devoting no time to the business. Instead, he spent all his time starting a new publishing company of his own.

20. In early 2014, Goyer decided to open a publisher division for the creation of a

politically- driven website called "Spangled Banner", which was supposed to produce traffic and internal publishing ability for BluePrint. This venture was unsuccessful. I subsequently learned that Goyer formed a new company under LongPlayer called "New Periphery LLC" in November 2014. Goyer secretly formed this new company, with a similar politically- driven website called "USHerald.com". Although he exploited the Company's intellectual property and other resources to form this publisher, he did so without the consent or knowledge of Mr. Vahdat and myself, and without bringing any revenue to the Company.

21. The Cake Tracking Platform is the brain and nerve-center for BluePrint's business. It is the one stop source to learn all about the Company's business activity. I am on the platform several times a day. Like access to the Bank Account, access to the Tracking Platform is limited. Only Mr. Vahdat, Goyer, myself, Mrs. Hays and a few other employees have access. We have a tracking system to enable us to see who logs on to the Tracking Platform and when.

22. Remarkably, Goyer—a one-third owner, required to devote not less than 50% of his time and business efforts to the Company –has not even logged onto the Tracking Platform since August 29, 2012. A screen shot recording that last log in is attached as **Exhibit D**.

### Souvah is Formed as a Publisher to Drive Business to BluePrint

23. Souvah is a company formed by Mr.Vahdat and myself out of necessity. Since Goyer completely failed to produce a viable publisher division for the Company, the business was foundering, and no contributions were being made by Goyer, far less than 50% of his time, we formed this publisher in 2014. Unlike Goyer, we did not misappropriate intellectual property belonging to the Company, usurp Company resources or divert corporate opportunities. On the contrary, Souvah produced and continues to produce revenue for BluePrint, which takes its brokerage cut for the business generated through the network.

24. Just as with the Bank Account, Goyer has access through the Tracking Platform to follow the business conducted by and between Souvah and the Company. The business between the two is also completely visible for Goyer by a review of the monthly P&Ls he receives. But Goyer has paid no attention to the business of BluePrint, as reflected by the fact that he last checked the Tracking Platform on August 29, 2012.

25. If Goyer had not disappeared to work solely on his own businesses, he would have seen Souvah's daily publisher activity and known that it was the only business keeping BluePrint profitable, the principal source of income to pay the Company expenses, including the monthly payroll. The Company has immediate obligations to stay in business. A list of those obligations for the period March 26-31, 2018 is attached as **Exhibit E**. Should this Freeze Order remain in place, the Company will be unable to pay its employees and pay its critical vendors.

## Defendants Have Not Violated the Operating Agreement

26. I do not have a signed copy of the Operating Agreement. I know that Goyer has not complied with the Operating Agreement. He has breached and continues to breach Section 10.1. He has breached and continued to breach Section 6.5 by failing to "act in good faith and with that degree of care that an ordinarily prudent Person in a like position would use under similar circumstances and shall perform diligently and faithfully [his] duties for the benefit of the Company in accordance with the Company's purposes, policies, procedures and objectives." He has breached and likely continues to breach Section 6.6 by not obtaining the other member's consent to the related party transactions. By his repeated and material violations of the Operating Agreement, it is difficult to fathom how he should get any equitable relief, let alone be the beneficiary of the Freeze Order that, if not lifted, will likely destroy the business of BluePrint.

27. Plaintiff name drops sections of the Operating Agreement without any analysis and

misled the Court about the nature of the transfers to Souvah. To repeat, these transfers were not the wrongful withdrawal of funds from the Bank Account; they were transfers to a publisher that is generating revenue for the Company and paying the Company its rightful margin. If plaintiff made the effort to explain this to the Court, and made a complete record, the Freeze Order should not have been entered.

28. Plaintiff first claims that defendants violated Section 6.1 (c) (a) (1) of the Operating Agreement. There is no such section, so we turn to Section 6.2 (a)(2), which restricts the Company, without the Consent of the Members (90% of the unit owners), to, in relevant part, "negotiate, incur, assume, or enter into any contract…or any other obligation or duty involving an expectation of incurring revenue or liability equal to or greater than $500,000 in any single transaction or series of related transactions." None of the complained of Souvah Transfers (which are $1,130,327.72 less than claimed by plaintiff) fall within this definition because neither revenue nor liability in such amount was triggered. Instead, the Souvah Transfers are properly characterized as withdrawals from the Bank Account, governed by Section 6.9, which provides, in relevant part: "All withdrawals from such accounts shall by made only by the Manager…; provided, however, that any withdrawal…in excess of $500,000 in a single transaction or series of related transactions shall require the signature of the Manager and one or more Members, who in the aggregate with the Manager shall represent no less than 40% of the outstanding Units on a fully diluted basis." Mr. Vahdat and myself together represent 66.66 % of the outstanding Units, thus satisfying this provision.

29. Next, plaintiff summarily states that defendants violated Sections 6.6 (b) and (c). Although defendants concede that they did not seek or obtain Goyer's consent in advance, he certainly had constructive notice of the Souvah-BluePrint business through the monthly financials,

access to the Bank Account and the Cake Tracking Platform. He further implicitly endorsed the business relationship by continuing to receive and accept the monthly $5,000 distribution checks from the Company, that have been derived from this business.

30. Even if his consent was not construed to be constructively given, the Operating Agreement sharply prescribes what happens if consent was not obtained. Section 6.6 (c) provides that the contract (i.e., the revenue generating one for the Company with Souvah) may be voided or avoided by the Company if not disclosed, that being the remedy. Only if plaintiff were to prove "Damages" under Section 6.7 resulting from such non-disclosures would it have further remedies. Given the fact that the Souvah-BluePrint business is presently the largest revenue source for the Company, it is difficult to see how such Damages would follow.

31. Lastly, plaintiff tosses in a reference to Section 10.5 without accurately quoting or even paraphrasing its terms. This section does not prohibit members from "soliciting any business from the Company..." Instead, it restricts solicitations, inducements and the like of employees, officers, consultants and others defined as the "Company Group" in 10.5 (a) to cease working with the Company. This did not occur, and plaintiff does not even allege it.

32. Section 10.5 (b) prevents solicitations, inducements and the like of customers, vendors and others defined as the "Prohibited Persons". This too did not happen and was not even alleged.

33. In sum, I respectfully request that the Court deny the Plaintiff's motion, lift the Freeze Order and permit the Company to survive.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of March 2018 in New York, New York.

                                                      JEREMY SOUSSAN