I3T3LONC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   LONG PLAYER L.P.,

 4                  Plaintiff,

 5           v.                              18 CV 2414 (LGS)

 6   GOLD MAIDEN, LLC, et al.,

 7                  Defendants.

 8   ------------------------------x
                                             New York, N.Y.
 9                                           March 29, 2018
                                             11:30 a.m.
10
     Before:
11
                        HON. LORNA G. SCHOFIELD,
12
                                             District Judge
13
                            APPEARANCES
14
     PETER J. REID
15        Attorney for Plaintiff

16   WACHTEL & MISSRY, LLP
          Attorneys for Defendants
17   BY:  STEVEN J. COHEN

18

19

20

21

22

23

24

25
```

I3T3LONC

```
1           THE DEPUTY CLERK:  Long Player LP v. Gold Maiden, LLC,

2    et al.  Counsel, please state your name for the record.

3           MR. REID:  My name is Pete Reid, I'm counsel for

4    plaintiffs.

5           MR. COHEN:  Good morning.  Steven Cohen, Wachtel &

6    Missry for the defendants.

7           THE COURT:  Good morning, everyone.  You may be

8    seated.

9           So, first of all, thank you for your papers and I know

10   it was a short deadline, so I appreciate that.  And I have

11   looked at them and I thought where I would begin, since I have

12   some familiarity with the plaintiff's position from having

13   issued the TRO, I thought I would hear from Mr. Cohen.

14          And although I think I may understand some things, I

15   am not entirely sure that I do.  So I thought, first of all, it

16   would be helpful for you to describe for me the nature of the

17   business.  I understand what the structure is, who the parties

18   are and what their various entities are, but I don't know what

19   this business does.

20          So, if you could explain that, that I think is

21   important background.

22          MR. COHEN:  Sure, your Honor.  I would be happy to.

23   The business of Blueprint is that of creating an affiliate

24   network which matches a network --

25          THE COURT:  A what network?
```

I3T3LONC

1          MR. COHEN:  An affiliate network.  Which matches a

2    network of publishers with a network of advertisers.

3          THE COURT:  All right.

4          MR. COHEN:  And Blueprint is the facilitator for those

5    two to match.

6          THE COURT:  Okay.

7          MR. COHEN:  In this day and age, when your Honor would

8    go on a computer at night and sometimes you would get in your

9    inbox some invitations from, let's say, I have the example in

10   my papers of AIG Insurance.  That would be an attempt by AIG to

11   get eyeballs on its website for a consumer who may be

12   interested in purchasing an insurance product.  And the behind

13   the scenes to get to the point where that AIG solicitation is

14   sent to a computer user --

15         THE COURT:  Sir, are you talking about banners?

16         MR. COHEN:  It could be banners, it could be social

17   media, it could be a Facebook page, it could be an e-mail

18   blast.

19         THE COURT:  So we're not talking about advertising in

20   the traditional sense that would appear on, say, you know,

21   Yahoo News on the side.

22         MR. COHEN:  I'm sorry.  Advertising in the

23   traditional -- I didn't hear.

24         THE COURT:  This is not advertising -- I forget what

25   the terminology is.  This isn't traditional advertising in the

I3T3LONC

1    sense that it appears on the publication page, even if it is an

2    online page.   This is advertising in the sense of reaching out

3    to consumers.

4              MR. COHEN:   Correct.

5              THE COURT:   Digitally somehow.

6              MR. COHEN:   Exactly.

7              THE COURT:   Okay.

8              MR. COHEN:   And the way the business works is that the

9    owners of a network such as Blueprint make it their business to

10   bring in advertisers and to bring in publishers who are in the

11   business of selling products for the advertisers through this

12   exchange.

13             THE COURT:   So, I get what the advertisers are.   They

14   are companies like AIG, companies with products to sell or

15   services.   But, what are the publishers?   We're not talking

16   about The New York Times, are we?

17             MR. COHEN:   Not talking about The New York Times.

18   We're talking about those businesses which can do marketing,

19   basically.

20             THE COURT:   That do what?   Can you speak into the mic?

21             MR. COHEN:   Do marketing in essence through the

22   internet for the owners of the brands.

23             THE COURT:   So they're basically internet marketing

24   companies.

25             MR. COHEN:   In a very general sense, correct.

I3T3LONC

1          THE COURT:  All right.

2          MR. COHEN:  So, what's happened here is that this was

3     a business which was founded in or about 2010, and my clients

4     Mr. Soussan, who is in the courtroom behind us, lives in New

5     York.

6          THE COURT:  Hello.  Thank you for coming.

7          MR. COHEN:  And Mr. Vahdat, who lives in California,

8     formed this company with the plaintiff Mr. Goyer to develop

9     this alliance network to create this type of business.  And

10    Mr. Goyer had the background in publishing, he had his own

11    entity called Hockey Bird.  You may have seen that reference in

12    the papers.

13         THE COURT:  I did.

14         MR. COHEN:  He was tasked with driving publishers to

15    the Blueprint network.

16         THE COURT:  So, driving publishers or driving Hockey

17    Bird?

18         MR. COHEN:  Hockey Bird was an example of a publisher.

19         THE COURT:  Was his job exclusively to put together

20    business between Blueprint and Hockey Bird or were there other

21    publishers that he was working with?

22         MR. COHEN:  Well, the idea was to bring additional

23    publishers to Blueprint and that was his primary focus.  Part

24    of the problem is he failed.  And then he went silent in or

25    about late 2013 or 2014.

I3T3LONC

1          THE COURT:  So tell me about the flow of funds in this

2     business.

3          MR. COHEN:  The flow of funds is the publisher would

4     send money, moneys to the -- I'm sorry.  Give me one minute,

5     your Honor.

6          THE COURT:  The advertisers would send money.

7          MR. COHEN:  The advertisers would send money to the

8     network.  The alliance in this case which would be Blueprint.

9     Blueprint would retain its agreed-upon margin for bringing the

10    two parties together, and the balance of the moneys would be

11    sent out to the publisher.  You got Hockey Bird which received

12    over $6 million from Blueprint over the course of this past

13    several years, or more recently Souvah, which is the entity

14    which is a defendant here, which we all know about.

15         The flow of funds was into the network, and then the

16    lion's share of it, generally, for argument's sake, 80 percent

17    or more goes out to the publisher whereby the network,

18    Blueprint, would retain its commission or fee.

19         THE COURT:  Just so it makes sense to me, can you

20    follow the money then from the publisher.  So the publisher

21    then keeps the money and arranges for the advertising, the

22    banners or whatever they are to be -- it actually arranges for

23    the outreach or it has clients?

24         MR. COHEN:  My understanding, your Honor, is the

25    advertiser, once it is connected with the consumer, deals

7

I3T3LONC

1    directly with the consumer for the purchase itself.

2            THE COURT:  I don't mean that.  So the advertiser

3    says, here, I want you to do advertising for me.  And so, the

4    publisher agrees to do that and what does the publisher do?

5    The publisher is getting the lion's share of this money.  What

6    does the publisher do?

7            MR. COHEN:  The publisher again is trying to connect

8    the advertiser to a product and then to an ultimate consumer.

9    It is a triangle.  You need the consumer to have an action.

10   The action is a click onto the website or completing an

11   application or actually purchasing a product or service.

12           THE COURT:  Right.  And I'm not so concerned about the

13   ultimate transaction.  I'm just concerned about the

14   advertising.  The publisher actually has the job of doing the

15   outreach, of doing the marking.

16           MR. COHEN:  And tracking the, as I put in the papers,

17   the journey of the potential consumer.  That's what the whole

18   what we refer to as the CAKE tracking platform does.  It issues

19   reports, it shows those who log onto the platform, the journey

20   of that potential customer or consumer vis-a-vis the product,

21   and the advertiser and the publisher is doing all that through

22   the network facilitated by a Blueprint.

23           THE COURT:  Got it.  All right.  So, now, I think I

24   understand from the declaration of Mr. Soussan in particular,

25   but explain to me then how what we just talked about fits in

I3T3LONC

1    with the transactions that the plaintiff was complaining about,

2    for lack of a better word.

3            MR. COHEN:  Sure.  So the transaction plaintiffs

4    complain about are these payment by the network Blueprint to a

5    publisher Souvah from 2014 to the present.

6            THE COURT:  Okay.  So, they're basically the payments

7    that Blueprint made to the publisher Souvah when Souvah in some

8    sense took over the business of Hockey Bird because Hockey Bird

9    went away.

10           MR. COHEN:  Yes.

11           THE COURT:  More or less.

12           MR. COHEN:  More or less.

13           THE COURT:  Are there other publishers besides Souvah?

14           MR. COHEN:  My understanding is there are some, but

15   Souvah is and has been for the past several years the principal

16   publisher for Blueprint.

17           THE COURT:  To the extent there are payments being

18   made out of this bank account, you would expect most of them to

19   go to Souvah because Souvah is the primary publisher.  Is that

20   right?

21           MR. COHEN:  I'm reluctant to say "most," your Honor,

22   but I've done my best in a very short period of time to get up

23   to speed on this business.

24           THE COURT:  You're doing a great job, so thank you.

25           MR. COHEN:  So I think the point is, all this

I3T3LONC

1    information has been available to the plaintiff throughout.

2                THE COURT:  No, I understand that.  But what I'm

3    trying to get to the bottom of is, is there something nefarious

4    going on here, or at least can the plaintiff sustain its

5    relatively high burden that something nefarious is going on?

6                MR. COHEN:  No.

7                THE COURT:  What you have done is you have presented a

8    very plausible explanation of what is going on here, and you

9    have submitted sworn testimony by two of the defendants

10   attesting to it in fairly specific terms.  So, I think I'm

11   finished with you for the moment.

12               Let me then speak to Mr. Reid.  So, the standard, as

13   you know, is quite high for a mandatory injunction.  And the

14   standard in fact in the Second Circuit is that it is your

15   burden to show a clear or substantial likelihood of success on

16   the merits, which is higher than the usual standard for

17   preliminary injunctions.

18               So, given what we have heard and the sworn statements

19   of Mr. Soussan and Mr. Vahdat, my first question is, can we say

20   "never mind"?  And if not, tell me why not.

21               MR. REID:  To answer your first question, no.  I'll

22   explain why not.

23               THE COURT:  Can you speak into the mic, please.

24               MR. REID:  I'm sorry.  If I may have a go at trying to

25   explain this as well, because Mr. Cohen is new to this.

I3T3LONC

1   Slightly newer than I am.  He's doing a very good job of

2   explaining it.

3         I don't think of it as a triangle.  There are your

4   advertisers and they're looking for someone to come to them.

5   It's done by a click.  It could be a click on an advert on your

6   page.  They are trying to get people to come to their website

7   or fill out some information, and they'll pay for people to do

8   that.  To bring people to their website.

9         The middleman is this affiliate marketer, which is

10  what Blueprint does.  Blueprint develops the software and

11  develops the code that tracks the clicks.  So once these

12  adverts are published on different websites, that's what the

13  publisher does.  They try to put it out there, you get it in

14  your e-mail box.  If you get an ad saying two for one tickets

15  to the Yankees.

16        THE COURT:  What we think of as spam normally,

17  unsolicited solicitations in your e-mail.

18        MR. REID:  Some people have described it as that.  So,

19  and people do click on these things.  That's why they're sent.

20  So, some people like them, some people don't.  But people do

21  click on them.  And when they click on them, so the Yankees may

22  pay out a dollar for everyone that buys a ticket from the link

23  they sent out.  The affiliate —

24        THE COURT:  So, do they pay by the links or by the

25  clicks?

I3T3LONC

1          MR. REID:  Depends on the relationship.

2          THE COURT:  On the deal, okay.

3          MR. REID:  So the affiliate marketer will track that

4   whole process and will collect the money from the advertiser,

5   collect that dollar.  Will retain 15, 20cents, 15 or 20 percent

6   for themselves, and disburse the rest to the publisher.  That's

7   how the flow of the transaction works.

8          THE COURT:  I got it.

9          MR. REID:  One of the things Mr. Cohen said was that

10   my client was involved in publishing initially and he was then

11   tasked with developing a publishing arm for Blueprint.  That's

12   what he was supposed to do. He tried to do it.  It wasn't very

13   successful.

14          But part of what Blueprint did was not just the

15   marketing, but they did try to expand into the publishing.  As

16   a justification for what they've done, the defendants have

17   said, well, we are going to try the publishing thing now.

18   Rather than do it through Blueprint, through the company, we

19   are going to set up our own company.

20          And the key difference between what Mr. Goyer did, was

21   that everybody knew about it.  And the main sentence in their

22   affidavit, and I have to tip my hat off to them for admitting

23   this, is that they concede they did not seek or obtain my

24   client's consent.  And that's why we can't just say no problem

25   here.

I3T3LONC

1          THE COURT:  Let's stop there.  I understand that you

2     have a dispute, that your client and the defendants have a

3     dispute about the lack of consent.  And I also understand that,

4     I think, you both agree that this matter should be arbitrated

5     and not litigated.

6          And so, the only question I'm trying to deal with is,

7     is this money going to disappear somewhere such that I have to

8     keep in place the restraining order.  And there is also the

9     serious question of whether Blueprint will be able to conduct

10     its business.  In fact, it looks like it would be impossible

11     for Blueprint to conduct its business if its bank accounts are

12     frozen.

13          What about that?

14          MR. REID:  Let me address that.  To your first point,

15     I don't think there is a dispute that my client was given

16     consent.  There's a lot of facts here that we can agree on.  I

17     think the question is just going to be whether or not that

18     violates the concept of self-dealing in Delaware.  Whether or

19     not it violates the operating agreement which says you cannot

20     have a relationship with another company in which you had a

21     financial interest.  And that you cannot solicit any party that

22     the company has a relationship with, and that would include

23     advertisers.

24          Souvah is using the network established by Blueprint,

25     the contacts established by Blueprint to profit themselves at

I3T3LONC

1    the expense of the company.  Now, so I think in terms of a

2    likelihood of success I think --

3            THE COURT:  Likelihood of success on what?  The claims

4    that you are talking about aren't claims that are pleaded in

5    the complaint.  They are the underlying claims that you would

6    bring to arbitration.  The only thing that's really in the

7    complaint is your request for injunctive relief, so I guess I'm

8    switching to the other element of preliminary injunction.

9            So there is the likelihood of success on the merits.

10   It is not clear to me what that means in this context where

11   there aren't really claims.  There is also the very important

12   question of irreparable harm.  And given what we know, why

13   should I think that you can't just resolve this by arbitration

14   and one side or the other will get damages?

15           MR. REID:  Right.  So, I have a proposal to that.

16   When we first uncovered this a few weeks ago, when I came to

17   you last week, my main concern was the dissipation of the

18   funds, and it was my recommendation to my client we should

19   freeze the accounts, because we weren't sure what level of

20   nefariousness this reached.

21           Now that the Court is involved, and now that Mr. Cohen

22   is involved, I am more satisfied or at least less concerned

23   about dissipation.

24           What I would propose, and what I proposed to

25   Mr. Cohen, and we've talked as well since Tuesday and I think

I3T3LONC

1    we're going to have a good relationship in this case.  Is that

2    there are two parts to the injunction:  One, that the records

3    and the assets not be disposed, and I would argue that should

4    still remain in force.  I don't think -- that should remain.

5    The second part is the assets should be frozen.  And I would be

6    willing to unfreeze the bank account, but with an order from

7    the Court that there should be no transactions to any entity in

8    which any of the members have a financial interest.  That's

9    clear in the company agreement, and that would at least assuage

10   my client's concerns that more money is going to be taken out

11   to this Souvah.

12          And so, that would be my proposal to really narrow the

13   order so that the company can continue, but I think it is in

14   everybody's interest that the company does continue.  It is

15   profitable.

16          THE COURT:  I'm not sure how that's really realistic,

17   though.  Because it means money can come in from the

18   advertisers, but it means the publishers, if it's Souvah,

19   doesn't get paid, right?

20          MR. REID:  Well, this is where the dispute is.  We

21   don't see any basis for Souvah to be allowed to be paid.  This

22   case is going to come down to --

23          THE COURT:  Souvah is providing the lion's share of

24   the business to Blueprint.

25          MR. REID:  If they had requested, if they disclosed

I3T3LONC

1    that and got the consent, there would be no issue.

2              THE COURT:  I understand, and you can fight about that

3    in arbitration.  Well, okay.  Let me hear from Mr. Cohen.

4              MR. COHEN:  Your Honor, as I put in my papers, I don't

5    think there is any way plaintiff can sustain the very difficult

6    burden it has to entitle itself to this extraordinary relief.

7    In the first instance, the plaintiff has unclean hands.  We've

8    put that in a sworn declaration of my clients about his failure

9    to abide by the very agreement he looks to enforce.

10             Even with the benefit of filing a supplemental

11   affidavit after I filed my opposition papers, and even after

12   filing the first amended complaint, nowhere is there any

13   pleading that, oh, yes, I have worked at least half my time in

14   the past four years as the contract requires me to towards this

15   business.  On the contrary, he hasn't responded to it, which is

16   somewhat remarkable.

17             Moreover, as we all know, a preliminary injunction is

18   there to maintain the status quo pending the ultimate

19   disposition of the merits.

20             THE COURT:  In this case asking for the assets to be

21   frozen was more than just maintaining the status quo.

22             MR. COHEN:  Of course.  That's the point I am making.

23   This is much further than that.

24             THE COURT:  Yes.

25             MR. COHEN:  And on the contrary, it's flipped the

I3T3LONC

1    status quo.  Status quo has been we'll continue to do business,

2    Souvah is the lead publisher for Blueprint, Souvah --

3              THE COURT:  I understand that.  And that's why it's in

4    effect asking for a mandatory injunction to change the status

5    quo.

6              MR. COHEN:  Exactly.

7              THE COURT:  And that's why the standard is the higher

8    standard.

9              MR. COHEN:  Precisely.  That's the point I was going

10   to make.

11             One other point, which I didn't have a chance to make

12   in my briefing but I want to raise it here, is the plaintiff

13   didn't even characterize this as a prejudgment attachment which

14   is what it is.  And that brings the question of Federal Rule

15   64.  Federal Rule 64 brings the question the governing state

16   law.  Under CPLR 6201, there is a very high burden there for a

17   plaintiff to get a prejudgment attachment, as the Court knows.

18   And one of the conditions are, in addition to likelihood of

19   success on the merits, is to prove that the defendants are out

20   of state.  And that's not the case here.  Mr. Soussan is here.

21   He lives in New York, the business of Blueprint is based in --

22   no.  The bank account is in Chase, a New York account.  So,

23   they don't even address it, and this is an attachment, and the

24   plaintiff cannot comply with the requirements of CPLR 6201 or

25   Rule 64.

I3T3LONC

1       THE COURT:  Do you agree that this dispute should be

2  resolved in arbitration?

3       MR. COHEN:  My answer to that, your Honor, is I'm

4  still -- if we determine that the operating agreement is in

5  effect even though it apparently has not been signed, my answer

6  would be yes.  And I may even as a general aside recommend it

7  to my client for this type of dispute.

8       THE COURT:  Okay.

9       MR. COHEN:  But I don't see any basis --

10       THE COURT:  I'm prepared to rule.

11       MR. COHEN:  Thank you.

12       THE COURT:  Okay.  So, let me begin with the standard.

13  The standard has been in place for a long time, but the Second

14  Circuit recently reiterated the standard for preliminary

15  injunction in <u>North American Soccer League, LLC v. United</u>

16  <u>States Soccer Federation, Inc</u>.  And that's at 883 F.3d 32 (2d

17  Cir. 2018).  The following is a quotation from that case.  I'll

18  provide the court reporter with the language just so she

19  doesn't get too upset when I read faster than I should.

20       "Courts refer to preliminary injunctions as

21  prohibitory or mandatory.  Prohibitory injunctions maintain the

22  status quo pending resolution of the case; mandatory

23  injunctions alter it.  A party seeking a preliminary injunction

24  must show (1) irreparable harm; (2) either a likelihood of

25  success on the merits or both serious questions on the merits

I3T3LONC

1    and a balance of hardships decidedly favoring the moving party;

2    and (3) that a preliminary injunction is in the public

3    interest.  Because mandatory injunctions disrupt the status

4    quo, a party seeking one must meet a heightened legal standard

5    by showing quote a clear or substantial likelihood of success

6    on the merits.

7            And I have omitted the quotations and citations from

8    the 2018 Second Circuit case, but what I just put in the record

9    is the Second Circuit's language.

10           So, it's clear to me that there are three requirements

11   here then in effect.  One is a showing of irreparable harm, two

12   is a clear or substantial likelihood of success on the merits,

13   and three, that the preliminary injunction is in the public

14   interest.  And the burden is on the party seeking the relief,

15   in this case the plaintiff.

16           So the procedural posture we are in right now is that

17   I previously entered a TRO, ex parte, in effect doing two

18   things, and that is freezing the bank accounts of the company

19   owned jointly by the plaintiffs and defendants, Blueprint, and

20   also requiring the retention of certain records and assets.

21   And we are here today to determine whether that temporary

22   restraining order should be converted to a preliminary

23   injunction, and for the reasons I will explain, I am dissolving

24   the restraining order.  And because the complaint was limited

25   to seeking injunctive relief, I am closing the case because I

I3T3LONC

```
1    will have ruled on everything that is at issue here.

2          Based on counsel's statements here at the conference,

3    the relief sought is narrower than the scope of the original

4    TRO.  And that is rather than freezing the bank accounts of

5    Blueprint, plaintiff would ask for an injunction against any

6    transfers of moneys to entities in which the defendants have a

7    financial interest, and in particular, the entity Souvah, LLC,

8    which defendants have described in sworn declarations as a

9    company that does business with Blueprint, that is owned by the

10   two individual defendants, and which acts as a publisher in its

11   business, and is responsible for a significant amount of the

12   business of Blueprint.

13         So that is one request the plaintiff is making, that

14   there not be any transfer of assets to entities in which the

15   defendants have a financial interest.  And also that the

16   injunction on disposing of any records or assets be kept in

17   place.

18         So, let me first turn to the question of irreparable

19   harm.  I originally granted the TRO because the plaintiff had

20   made at least a plausible showing that the defendants were

21   essentially making secret payments to themselves and

22   essentially stealing money from the company and putting it in

23   their own pockets.  And if that were the case, it seems to me

24   there would be a serious question about whether anyone,

25   including the plaintiff, could rely on moneys still being in
```

I3T3LONC

1   place when this matter is resolved.

2            Given that there seems to be a reasonable business

3   explanation for the transfer of funds, that the explanation is

4   based on sworn statements of the individual defendants here, I

5   don't find that the plaintiff has met its burden of showing

6   irreparable harm.

7            With respect to the second element, which has to do

8   with the merits, and a showing of a clear or substantial

9   likelihood of success on the merits, the plaintiff's argument

10  rests primarily on the lack of consent, which is required by a

11  contract that was submitted in connection with the temporary

12  restraining order.

13           Neither party has submitted to me a signed version of

14  the contract, and there seems to be a serious question, even on

15  the part of the parties, as to whether it was signed.  And

16  there is also the separate question of whether the contract is

17  in force.  It may reflect an oral agreement between the parties

18  or it may be an enforceable contract, notwithstanding that it

19  wasn't signed.

20           In any event, the complaint that is before me does not

21  allege a breach of contract, and it does not allege any other

22  claims for relief, apart from the injunctive relief that I'm

23  addressing now.  So it is very hard for me to assess clear or

24  substantial likelihood of success on the merits.  And given

25  that, my finding is that the plaintiff has not met the burden

1    of showing a substantial likelihood of success on the merits.

2          I would also just add that even if the plaintiff were

3    to amend the complaint to add something like a breach of

4    contract claim, it appears that the parties have agreed, but

5    not entirely clear, but perhaps have agreed, that the matter

6    should be arbitrated.

7          But making a preliminary finding, based on what I have

8    seen, I do not find that the plaintiff has shown a clear or

9    substantial likelihood of successes on the merits, even with

10   respect to an underlying claim, but only because that standard

11   is quite high at this stage.  So nobody should read into

12   anything I'm saying, an opinion that anyone should rely on in

13   any subsequent merits litigation about the merits.

14         And then with respect to the public interest, I

15   haven't heard any arguments that I find persuasive that having

16   an injunction in place would be in the public interest.

17         I would just note with respect to the retention of

18   records, clearly the defendants are on notice that there is a

19   dispute here, and that it is likely to find its way into

20   litigation or arbitration.  I think under those circumstances,

21   there is an independent obligation on the part of the

22   defendants to retain their records.  I'm sure Mr. Cohen will

23   cover that with your clients if you haven't already.  And so, I

24   will rely on that for the integrity of some future proceeding

25   that relies on the records.

I3T3LONC

1            So for all of those reasons, I am vacating the

2    temporary restraining order, denying the application for

3    preliminary injunction, and closing the case.  Thank you.

4            MR. COHEN:  Thank you, your Honor.

5            (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25